The next case for argument is 17-2354, Enzo Life Sciences v. Gen-Probe. Mr. Wilcox, whenever you're ready. Good morning, Your Honor. May it please the Court, Justin Wilcox of the Maris LLP on behalf of Appellant Enzo. The District Court committed two fundamental errors in granting summary judgment of non-enablement. First, the District Court erroneously resolved factual disputes in summary judgment. It incorrectly found that no dispute of material fact existed as to the specification did not disclose phosphate-labeled polynucleotides that would maintain hybridizability and detectability, despite the fact that defendant's experts admitted just the opposite, that any labeled polynucleotide would be hybridizable and detectable, and despite the fact that the District Court in its own written description analysis found a fact dispute as to whether the specification disclosed phosphate-labeled polynucleotides that were capable of hybridization detection. On this point alone, the Court should have denied summary judgment. Abbott says in the red brief that Example 5 offers an untested labeled polynucleotide that you to this day have never confirmed remains hybridizable and detectable. Not even your own experts saw any evidence that they did such testing. May I have that in quotes? Is that true? We would disagree with Abbott's characterization. There's proof in the record that Example 5... So where is that record proof? Your Honor, we have the testimony of inventor Dr. Stavrionopoulos that Example 5 taught internal phosphate labeling. That's in Appendix 7006. That's cited on our reply brief at page 7. He also testified that it would not be difficult to label with Example 5 and that Example 5 would 100% work as a hybridization probe, and that's at Appendix 5298. Is that the question that the parties debated about whether this was a paper example or a working example? Because the other side cites the inventor testimony where the inventor said, or maybe you relied on it, where he suggests that maybe he did perform it, might have been around 1982, I don't remember that now. So the other side comes back and says, no, no, no, no, there's not enough specificity in that. Is that what we're talking about? Or is there another statement by the inventor they're talking about? Your Honor, this would be that statement. I think this shows that there is a classical fact dispute that should have precluded some re-judgment. In fact, the District Court in its written description analysis found a disputed fact as to whether this was performed. When a fact that requires a trial, when the inventor comes up, you want him to say, I did it working, even assuming that the end result, and he says, I don't remember that, we have to have a trial why to try to make him to remember that? Your Honor, we came forward with evidence and the inventor, Dr. Stabenow, has testified that he used the Example 5 chemistry to label the phosphate label of polynucleotide probe. There is testimony to that fact from Dr. Stabenow. Now, in terms of, you know, I think this goes to the argument that the defendants made about whether there's actual evidence of using this probe, you know, in an actual experiment. There's no evidence of that, but there is absolutely no evidence that this would not work for its intended purpose to be used as a probe. And defendants had the burden to come forward, because it's their burden of proof on non-enablement, to show that some claimed embodiment would not work. But they haven't provided any evidence of that, and that's why we would say the court's second fundamental legal error was to shift the burden to ENSO to prove that these claimed inventions would work, especially absent no evidence to the contrary. So you say, I'm claiming a million probes, and the functionality of them is that they all result in, I hate to say this word, hybridization and degradation. And the burden is on them to show that some of the million don't work for that? Is that your analysis of how we apply enablement? Your Honor, it's their burden, yes, to come forward if they're claiming non-enablement and show that there's some non-working embodiment. And that's been the case law, that's in the outcome of our case. Well, what have you disclosed? The question is, what have you disclosed in the specification to support the fact that you've enabled the hybridization and degradation of millions of probes? Yeah, and let me add to that, because it's the same question. In 42 and 43 of the Redberry, Abbott says, it's undisputed that the specification nowhere discloses how to achieve those properties for any, much less every combination of label linker and labeling position, nor guidance on which combinations are likely to have those features. Your Honor, that's what was quoted. I would first say that, one, the defense didn't come forward with any specific examples. If this was so obvious that something wouldn't work, they should have come forward with an example of non-working embodiment. But the test on enablement is whether a skilled artisan could make and use the claim dimension. Where in the record does the specification show how to achieve what they're talking about in the Redbrief? Your Honor, first, the specification discloses in Example 5, a specific chemistry for labeling any RNA or DNA sequence with any of the labels that are identified in the pattern. That's the first thing. So that teaches a skilled artisan how to create the claim phosphate-labeled polynucleotide. Then an artisan would look at the remainder of the specification, and in particular, column 54, 18 through 45, where there's a discussion of how to also other design considerations, like the length, the number of nucleotides, that it's preferably 12 nucleotides would be possible to identify any disease date. And then we take that along with the specification that talks about the use of these probes for hybridization. At this point in 1982, hybridization was well-known. Skilled artisans had been doing hybridization for years. In the patent, in column 17, it talks about the northern and the southern hybridization techniques. It talks about in-situ hybridization techniques. So fundamentally, what the defendants argued, what the district court did, was really shrink down the frame of reference just to these phosphate-labeled polynucleotides, which are the claimed event of improvement, and saying, well, you have to ignore all of the other understanding in the art up until that time, which was just wrong. Because once the technology and the understanding is taught about how to make these probes, then the use of the probes in standard hybridization— When you say make these probes, what are you talking about? Are you talking about the functionality that you've claimed here, which I guess makes this an invention versus a non-invention, which is we're doing these and they provide—achieve hybridization and detection? That wasn't known in the art, right? Your Honor— Can you just answer my question first and then you can explain it? Yes, Your Honor. The invention here was the phosphate labeling of the probe and the use of this phosphate-labeled probe to be able to be detectable after hybridization. Those are the— And that wasn't known in the art? That was not known in the art. Okay. So we come forward with Example 5. It teaches the precise chemistry for attaching a label to the phosphate. Does it teach where in the base the attachment is to occur? Yes, it does. It does, Your Honor. If we turn to 54, to column 54, 18 through 45— What's the paging number of the appendix? Yes, Your Honor. That would be Appendix 456, Your Honor. We're talking about the 180 here, right? Correct, Your Honor. Okay. First, in that section, this gives guidance on— I'm sorry. Can you tell us where we're looking again? I lost track. So that would be Appendix Site 456. Yes, which column? And that would be column 54, lines 18 through 45. In that passage right there, first of all, it teaches how to pick a sequence. I mean, that was already, you know, Probe 101, that one would pick a sequence complementary to the type of disease date sequence you're trying to locate. But it teaches that specifically right there. Then it goes on to discuss how to decide the length. It recommends a length of between 5 and 500 nucleotides. It also teaches that 12, quote, 12 matching preferably consecutive nucleotide units would be sufficient to affect identification of most DNA or RNA material to be investigated or identified. Would you agree that the claims require attaching a label without interfering with the polynucleotide's ability to hybridize or the label's detectability upon hybridization? That's correct, Your Honor. Okay. And that's the preceding sentence to what I read to you before, which is it's undisputed that the specification nowhere discloses how to achieve those properties for any, much less every, combination of labels. Where does it do that? Your Honor, the chemistry in Example 5 teaches a skilled artisan how to phosphate label a polynucleotide that will result in a phosphate label a polynucleotide that's capable of hybridization and detection. You know, Dr. Stavrinovel has testified to the fact that the phosphate labeling is essentially what he called outside. It's outside the basis. The basis of a polynucleotide are what come together with another sequence to bind. So the labeling on the phosphate is outside the basis. But even if a person skilled in the art could create this full range of structures covered by the claim, where's the guarantee that each of the structures would be hybridizable and detectable? Yes, Your Honor. See, that's the issue here. The test of enablement is not to guarantee that every embodiment works or that the claimed invention would work. Or any embodiment. So, pardon me, Your Honor. Let me rephrase. The test is not to guarantee that the claimed invention will work. And the courts recited that in the Alcon v. Barr case. What it's doing here is it's supposed to teach one to make and use without undue experimentation. Well, to make and use in a way that works. Make and use in a way that works. Yes, Your Honor. And the full scope of the claim, too. Yes, Your Honor. And so we have the full scope of making, through example five, being able to label any RNA or DNA sequence along with any label that's described here. And then the hybridizability aspect. You know, one would use these in typical hybridization experiments as it's laid out in the specification. Maybe they'll work for their intended purpose and maybe they won't. Well, Your Honor, I think that's the problem. And it's up to them, then, to show that they don't out of these millions of probes? Your Honor, well, I think that's part of the skepticism here. There's always skepticism about the utility of some kind of new improvement. And here it's undisputed there is skepticism about labeling outside of certain base positions that that would even work. But the test enablement is not to dispel this skepticism. It's to teach when to make and use. And there's no evidence in the record that using example five and running a hybridization assay that any claimed embodiment would not work. And I think that's the fundamental issue here. We've set forth disclosure in the specification how to make, how to use. And then the district court then went on to say, well, we would have to prove that a vast number of these embodiments would work. Okay, we're into rebuttals, so I want to hear from the other side. Thank you. Now, you're dividing your argument? Yes, Your Honor. Is there a method to this? I mean, are you arguing one thing and your friend the other? Yes, Your Honor, there's a little rhyme and reason. Matthew Wolf for the non-Abbott defendants. I'm going to argue enablement of the 180 patent, which we were just discussing, and also, if Your Honors are interested, the indefiniteness issues related to 180. And then my friend will argue written description and then the 405 issues to the extent there are questions about that. Okay, can you start with what your friend ended with, which was what the test is for enablement and who's got the burden to show what? Do you agree with his assessment of that? I don't, Your Honor. The point of enablement, of course, as Judge Raina suggested, is have you established that you have instructed, educated those of skill in the art to make and use the full scope of the invention. At best, at best, Example 5 teaches you how to make one part of one species of one example of the invention. Talking to Your Honor, Judge Wallach, you asked about what was admitted or stated regarding Example 5. Dr. Stavronopoulos, the same inventor. Yeah, you say that his statement is entirely ipsedixic. It's worse than that because it directly contradicts what was sworn to the Patent Office in 1987. This is at A4703 where they said, quote, it was determined that it was a paper rather than a working example. And they go so far as to apologize that the language suggests it was actually performed. They call it, quote, an inadvertent misstatement. This is, again, A4703. But even with all that, Dr. Stavronopoulos saying, I have some vague recollection. I might have done this in 82. He then said, well, yes, but, quote, we never make a probe out of it. That's at A5293. So even if you accept that they did something with the haloran chemistry, that's the article, the 1966 article that somehow has become the bedrock of this entire invention, was this 25-year-old chemistry. Even if you accept they did something with it, their own inventor, the linchpin of their there must be a fact issue here argument says we never made a probe out of it, let alone figure out whether it's hybridizable or detectable when hybridized, let alone actually disclose it within the four corners of the patent, which is, of course, the test. And, in fact, there's an interesting shift that occurred here. At the district court below, the bulk of the argument, the gist, any fair reading of what they said is the one of ordinary skill would know how to do that. And Judge Stark threw up his hands and said, that's not the test. The test is did you teach it? Now they've shifted gears on appeal and said, well, it's really all about Example 5. But Example 5, as I said, at best teaches a small part of one species of making the probe. And there's really three things that have to happen here for it to be enabled. First, they have to make a probe. Then they have to figure out whether it's hybridizable. Then they have to figure out whether it's detected when it's hybridized. And I don't want to belabor this, but Dr. Klein, one of the inventors, admitted at A4249 and 6494 that individual experiments need to see if the label or the linker impacts hybridization. We were pointed to a specific paragraph in the patent that didn't say anything about what linkers would work and what that would mean for hybridization detection. Well, I asked that question repeatedly. And certainly didn't say which of the hundreds of, I mean, I think the admission is hundreds of thousands of potential labels alone. That's what Dr. Klein said. And they admitted that some linkers, I mean, some labels do or do not get detected. Some labels do or do not interfere with hybridization. And that requires, quote, case-by-case experimentation. This is a good point for me to ask this particular question because I think you said you were also going to address indefinite. Yes, Your Honor. All right. So it seems to me that what these patents cover, it recognizes the Ward patents. Yes, Your Honor. And it seems to me that in some way the patents say, and we cover everything else. Yes, Your Honor. That's exactly right. So Dr. Ward spent, his colleagues at Yale spent eight years, six in the lab, eight years overall. And why is that? Is it because the patents don't teach where the attachment to the base is to occur? No. The Ward patents, the ones that were incorporated wholesale are the 30 columns of Ward. And Dr. Ward got his own patents on what are called the Ward positions now. I mean, this is legendary chemistry he did. But Dr. Ward figured out three specific places with three specific labels out of everything else that would actually work on the base. And then Enzo took a license to that. And this is admitted, and this is in the record. And they said, well, we're concerned that people are going to design around this, you know, and it's hard work. So we're going to just do a paper patent that says everything else, everywhere else on the bases, everywhere on the phosphate moiety, everywhere on the sugar moiety, we're just going to claim that. Does it really say that everywhere else on any part of the bases? Or is there a failure to state where on the base the attachment is to occur in order to be able to hibernate? Yes. Your Honor, it is conceded. These particular patents, the 180 patent is dealing with the phosphate moiety. My colleague will talk about other positions that are relevant uniquely to his client. Okay. But this particular patent is, at least the claims at issue are, attach anything to the phosphate. Remember, Dr. Ward spent years trying to figure out how to do the base. We're going to do the phosphate. And this is state of the art at the time. I think this is undisputed. It was a holy molecule. This is Dr. Rabani, the CEO. They thought anything you did to modify it would risk retaining its attributes. It was, quote, dogma that phosphate labeling would be disruptive to how it behaved. That's at A6465. So to this day, I mean Dr. Stavronopoulos acknowledged, to this day it's hard to label phosphates. Particularly, there's another fight we had at the district court that did not go well for plaintiffs, was internal versus terminal phosphate labeling. If we imagine 100 nucleotide long polynucleotide, there are two terminal phosphates. Halloran, example five, says here's how you can label at the ends. And he wasn't even talking about labeling. He was talking about tying to a protein. But here's the chemistry to attach something to the ends. There's nothing about the 99 internal phosphates, and that's where the admissions that when you get to internal phosphates, that's what disrupts hybridization. That's what causes hydrolysis. They said at the time you couldn't even synthetically make more than 15 of these, yet they claim up to 100,000. I'm belaboring this, and the horse is being beaten. But I'm not sure, unless there are any other questions, I'll give Mr. Quinn time. Do you want to say a word? I thought you were going to ask about indefiniteness. I did. Okay. With that, Your Honors, unless there's anything else, I'll turn it over to Mr. Quinn. Thank you. Thank you, Chief Judge Prost. May it please the Court, John O'Quinn on behalf of Abbott. Judge Reina, the point that you made a moment ago, the Ward patent claims a specific label on three of the base positions. In the 405 patent, they attempt to claim everything else, every other position, every other base position, every sugar position, every phosphate position, whether it's a monophosphate, a diphosphate, a triphosphate, and they try to claim it all without ever doing a single test to show hybridization and detectability. And that's conceded by their experts at Appendix 6441, 84, 68, and 8552. And the only testing that my friend referred to was the suggestion by Dr. Stavrianopoulos, one of the inventors, that they may have labeled back in 1982 using Example 5. But as my colleague, Mr. Wolf, pointed out, there's no evidence that beyond labeling with Example 5, they actually did any testing of Example 5. These patents are the epitome of attempting to preempt the future before it arrives. At most, they both disclosed that some combination of labels, linkers, location, and nucleotides might be able to be used as a probe that would both hybridize and remain detectable, but nothing in the patents told a skilled artisan in 1982 which ones would and which ones wouldn't, much less how to determine that except through trial and error. And that is why this case is very analogous to Wythe, because as the inventors and both of ENSO's experts ultimately admit, you couldn't know ahead of time whether a particular labeled polynucleotide would actually be hybridizable and detectable.  with respect to the 405 patent at Appendix 8455 said, He said there was no ability to predict. One of the inventors, Dr. Klein, said the same thing. Dr. Backman, one of their experts at Appendix 6451, said you could not, quote, And that was for labeling at the phosphates. Of course, the 180 patent only involves... But of course, that doesn't answer the question that your friend posed, which was the question before us is whether or not there's enough of a factual dispute to get us to trial. So all of what you said is maybe correct, but kind of conclusory. So what do you say to the arguments your friend makes with regard to at least being a factual dispute? Well, I think, Chief Judge Prost, there's not any factual dispute that there's no evidence of any testing whatsoever with respect to hybridization and detectability. There is nothing in the patent itself that will teach a person of ordinary skill in the art how to make one of these and know that it will be hybridizable and detectable. It's not enough to teach, and we dispute that they do this, but it's not enough to teach labeling. You've got to teach labeling of a polynucleotide that will hybridize and be detectable. And when every single expert... And this is what I was just... The list that I was rattling off, and there are more. I mean, Dr. Waldrop, for example, who was part of the ward group, he said, quote, That's Appendix 6509. When every single inventor, when ENSO's consultants, when ENSO's experts tell you that the only way to know is to make it and then test it, then that falls in the heartland of this court's decision in Wyeth. Because it is undisputed. There are millions of possibilities here. I mean, there are thousands of fluorescent labels alone. And you would have to go through, in order to know whether or not it would actually be hybridizable and detectable, you'd have to go through and test it. And that is the epitome of undue experimentation, both under the Wands factors and under this court's decision in Wyeth, and I think this court's decision in... And also, of course, Wyeth was decided on summary judgment, precisely because there were no facts that were relevant. I mean, sure, I don't agree that there is actually a dispute vis-a-vis labeling, but even if you assume that there were, that's not enough for them in order to create a material issue of fact with respect to whether or not these patents are actually enabled. If the court has no further questions... Thank you. Thank you, Chief Judge Prost. Your Honor, what sets this case apart from all the other non-enablement decisions that the defendants rely on, and that shows that there is, in fact, a dispute, is that Abbott's own expert testified, quote, is it your opinion in connection with your analysis of invalidity in this case that disclosure of a non-radioactively labeled oligonucleotide inherently discloses a non-radioactively labeled oligonucleotide that is detectable and hybridized? Answer, yes. And that's on appendix 12138 through 139. We've cited that in our opposition brief at 26 and 51, pardon me, our opening brief and our reply brief at 6. Now right here, that expert is essentially admitting just the opposite of what the court found, that any labeled polynucleotide would be hybridizable and detectable. So that's completely contrary to what the defendants are arguing here, that nobody would know that this would work. This is their expert's testimony of what would be known in the art at the time of the invention. Just moving on to address some of the alleged evidence of inoperability that my friends talked about. Those quotes from Dr. Klein, the quotes from Dr. Sherman, those are all relating to base labeling. Base labeling is involved in the claims of the 405 patent. It's not involved in the claims of the 180 patent. So there's no actual evidence of any inoperability. The defendants have come forward. They haven't been able to point to any. And even if there were, there would still be a disputed issue of fact. But I think what the arguments boil down to is this issue of skepticism. And I think that they're mistaking skepticism in the art about whether this would work versus predictability. There was predictability in the art. Artisans knew how to make hybridizable sequences. They knew the basic concepts of Watson-Crick base pairing that had been around since the 1950s. Overall, there's no requirement in this court's enablement precedent to require somebody to convince a skeptical artisan that the claimed inventions would work. The artisan's supposed to come forward with their knowledge of the art and take at face value what's in the patent. And if we look at that, we take at face value what's in the patent. We teach how to make a numerable number of phosphate-labeled polynucleotides with example five. We teach how they're supposed to be used in hybridization assays. Now, this court addressed some similar skepticism in the Allergan v. Sanders case where the defendant argued that a skilled artisan would not accept, quote, without doubt, the asserted utility of the claimed invention without efficacy data. But the court rejected that argument. This court said a patent does not need to guarantee the invention works, that efficacy data is generally not required. So here, Your Honor, we have a case where, in the face of no actual proof that any claimed embodiment would work, the district court shifted the burden to Enzo to prove that the claimed inventions would work, which is a fundamental error, and also resolved material fact disputes against Enzo in summary judgment, which is contrary to summary judgment principles. Thank you. We thank both sides, and the case is submitted. That concludes our proceeding for this morning. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m.